[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13394
Non-Argument Calendar

_____

D.C. Docket No. 1:16-cr-20753-CMA-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BELLO JUNIOR PIERRE LOUIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 7, 2021)

Before NEWSOM, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

Bello Junior Pierre-Louis appeals his felon-in-possession conviction.  He

makes four arguments.  First, Pierre-Louis contends that the district court erred by

denying his motion to suppress certain evidence recovered after a dog sniff. Second, he argues that the district court lacked subject matter jurisdiction over his prosecution because the government failed to establish an interstate commerce nexus. Third, Pierre-Louis claims that the district court abused its discretion by admitting evidence of his prior felon-in-possession conviction under Federal Rule of Evidence 404(b). Finally, Pierre-Louis argues that the district court abused its discretion by neither investigating nor excusing a deliberating juror for alleged juror misconduct. After careful review, we affirm.

I.

On the morning of February 15, 2016, Trooper Alberto Gutierrez was patrolling a Florida highway. While parked on the highway's right shoulder, he observed a silver Kia with a window tint violation and an expired temporary tag. At 8:29 am, Trooper Gutierrez ran an in-vehicle records check of the car's registration. As it turned out, the car's registration was missing specific vehicle information and the tag's actual expiration date was different than the date printed on the car's paper tag.

Because of the discrepancies, Trooper Gutierrez turned on his lights and conducted a traffic stop. There were two individuals in the car. The driver, Pierre-Louis, provided a Florida learner's license but was not able to provide registration, title, or proof of insurance. He did give Trooper Gutierrez the name of the person

2

who allegedly owned the car, but it did not match the name listed in the records check. The passenger provided a Florida ID. Trooper Gutierrez testified that at this point, he "was perplexed as to whether this vehicle was stolen" and "whether this tag was a fraudulent tag." So he returned to his patrol car with both IDs in hand and contacted his partner, Trooper William Lopez, for backup. At 8:35 am, Trooper Gutierrez ran record and Florida Crime Information Center checks on both Pierre-Louis and the passenger. Although Pierre-Louis's learner's license was valid, the passenger did not have a valid license—so Pierre-Louis was driving unlawfully on a learner's license because he was not accompanied by a person with a valid license.

Trooper Gutierrez returned to the stopped car and asked Pierre-Louis to step out of it. He then checked the car's VIN number, which he radioed to the Florida Highway Patrol dispatch. A few minutes later, dispatch replied that the vehicle's assigned tag had expired in 2013, but that the car had not been reported stolen. While Trooper Gutierrez was getting that information from dispatch, his partner, Trooper Lopez, arrived at the scene. The troopers then separately questioned Pierre-Louis and the passenger about their itinerary. The two gave "conflicting" answers; Pierre-Louis told Trooper Gutierrez that he was on the way to "meet a girl in Miami Gardens" and the passenger told Trooper Lopez that they were "on their way to a funeral." During the questioning, Pierre-Louis was "visibly

3

nervous" and "fail[ed] to make eye contact." The passenger was "high-strung" and "eager to claim his innocence for whatever was in the vehicle."

At 9:05 am, after questioning Pierre-Louis and the passenger, the troopers decided to have Trooper Lopez's police dog sniff the car. While Trooper Gutierrez was with Pierre-Louis and the passenger, Trooper Lopez walked his dog around the car. The dog alerted to the area around the car's glove compartment, so the troopers conducted a hand search there and found a loaded Taurus 9 mm firearm and a plastic bag containing suspected narcotics, which turned out to be crack cocaine, heroin, and bath salts. A later examination revealed that the firearm was stolen and that Pierre-Louis's fingerprint was on the magazine. The troopers placed Pierre-Louis and the passenger under arrest, and dispatch informed the troopers that both individuals had prior felony convictions. Trooper Gutierrez then "finished up [his] initial traffic stop" by measuring the car's window tint and issuing three traffic citations: one for the window tint, one for driving with a learner's license while unaccompanied by a licensed driver aged 21 or older, and one for the expired tag.

In August 2017, Pierre-Louis was charged in a superseding indictment with, among other things, possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Pierre-Louis moved to suppress the evidence discovered after the dog sniff, reasoning that Trooper Gutierrez stopped him for

"longer than necessary to issue him citations and lacked reasonable suspicion to believe that criminal activity was afoot." The government argued in response that the traffic stop was justified by reasonable suspicion and probable cause; that the stop was lawfully prolonged when Pierre-Louis was unable to provide registration or insurance information and was unable to name the vehicle registrant; and that the dog sniff did not prolong the stop beyond the time reasonably required to complete the stop's mission. The district court denied the motion to suppress, concluding that the "sniff was conducted in the middle of the traffic investigation and . . . did not prolong or delay the trooper's investigation into all of the inconsistent information Trooper Gutierrez was being confronted with."

Before trial, the government filed notice of intent to introduce two of Pierre-Louis's prior felon-in-possession convictions: one from 2012, and one from 2013. The 2012 conviction came after Pierre-Louis was kicked out of a nightclub in Miami. He retrieved a Glock 17 from his car (which was registered to him) and pointed it at the nightclub's employees and patrons. For the 2013 conviction, the police received a call that "a man in a white Hyundai Genesis automobile [was] brandishing a handgun." The police stopped the car (which was *not* registered to Pierre-Louis) and spotted a Glock handgun sitting under the dashboard. Pierre-Louis opposed the introduction of his prior convictions under Federal Rule of Evidence 404(b). He argued that "the intended evidence is not inextricably

intertwined with the charges brought against [him], does not meet the standards of Rule 404(b), is highly prejudicial, and not probative of the charges." The government contended in response that the defendant's prior felon-in-possession convictions were "relevant to establishing the Defendant's knowledge, intent, and lack of mistake with respect to the instant offense."

The district court ruled that the government could admit the 2013 conviction but not the 2012 conviction. The probative value of the 2012 conviction, it concluded, was "far less than the prejudicial impact and undue prejudice to the Defendant." But the district court reasoned that the 2013 conviction satisfied Rule 404(b) and was "sufficiently similar" to the case at hand. So the court admitted only Pierre-Louis's 2013 conviction, which consisted of a copy of the 2013 information, judgment, sentence, and case file sheet. It also introduced the testimony of retired Miami Police Officer Rosco Bradley, who testified that during the 2013 traffic stop, the firearm was recovered from underneath the driver's dashboard and that Pierre-Louis was driving. The district court gave two limiting instructions, telling the jury that it may only "consider this evidence to decide whether the Defendant had the state of mind or intent necessary to commit the crimes charged in the indictment or whether the Defendant committed the acts charged in the indictment by accident or mistake."

6

The trial lasted about two days.  The jury retired to deliberate at 3:30 pm on Wednesday.  After roughly an hour of deliberations, Juror 19 sent a note to the judge.  In it, Juror 19 said that she was concerned the deliberations would "last another day" and explained that she had work appointments scheduled for the following day and needed to be able to pick up her nine-year-old daughter.  Pierre-Louis asked the court to release Juror 19, stating that he did not "want an unhappy juror there."  The government, however, requested that the court give Juror 19 the following response:

> While[] we understand your schedule, tomorrow you will be asked to report at 10:00 a.m.  If you need to leave early to pick up your daughter, please let us know the time that you have to leave.

The court agreed to issue the government's requested response.  It observed that Juror 19 had been able to reschedule her appointments throughout the trial and that it would wait to see if she could do so again.  Pierre-Louis asked the court if it wanted to speak with the juror, but the court declined to do so.  Pierre-Louis then objected to the written response.  At 4:56 pm, the court took a recess and, about 15 minutes later, the jury announced its verdict.  The jury convicted Pierre-Louis on the felon-in-possession charge, and the district court sentenced him to 57 months' imprisonment.  This appeal followed.

II.

As we noted above, Pierre-Louis raises four arguments on appeal. After careful consideration, we reject all four.

A.

Pierre-Louis first argues that the district court erred by denying his motion to suppress the evidence recovered after the dog sniff. In his words, the "sniff unlawfully prolonged the [traffic] stop in violation of [Pierre-Louis's] Fourth Amendment rights." "We review a district court's denial of a defendant's motion to suppress under a mixed standard of review, examining the district court's findings of fact for clear error and the district court's application of law to those facts *de novo*." *United States v. Vargas*, 848 F.3d 971, 973 (11th Cir. 2017) (quoting *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007)). We construe all facts "in the light most favorable to the prevailing party below" and "afford substantial deference to the factfinder's credibility determinations, both explicit and implicit." *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) (internal quotation marks omitted).

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). But if a traffic stop "exceed[s] the time needed to handle the matter for which the stop was made," it violates the Fourth Amendment. *Id.* at 350. "[I]n addition to issuing a ticket or

8

warning, a police officer's 'mission includes ordinary inquiries incident to the traffic stop.'" *Vargas*, 848 F.3d at 974 (alteration adopted) (quoting *Rodriguez*, 575 U.S. at 355). Those inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. "Because they 'serve the same objective as enforcement of the traffic code'—namely, 'ensuring that vehicles on the road are operated safely and responsibly'—those inquiries do not unconstitutionally extend the traffic stop." *Vargas*, 848 F.3d at 974 (quoting *Rodriguez*, 575 U.S. at 355).

Additionally, a traffic stop may be extended when there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999) (internal quotation marks omitted); *see also Rodriguez*, 575 U.S. at 355 (stating that an officer may prolong a stop when there is reasonable suspicion to "justify detaining an individual"). Reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). It requires only a "particularized and objective basis," which we evaluate based on the "totality of the circumstances." *Lewis*, 674 F.3d at 1305 (internal quotation marks omitted). "Reasonable suspicion need not involve the observation

9

of illegal conduct, but does require more than just a hunch." *Id.* at 1303 (internal quotation marks omitted). It can exist even if "each fact alone is susceptible of innocent explanation." *United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009) (internal quotation marks omitted).

The government argues on appeal that, even if the dog sniff prolonged the traffic stop, "reasonable suspicion supported conducting the dog sniff." We agree. Although Pierre-Louis says that Trooper Gutierrez "should have allowed him to leave" after determining that he had a valid learner's license and no warrants, Trooper Gutierrez had a "particularized and objective" basis for suspecting criminal activity and, therefore, reasonable suspicion to further detain Pierre-Louis and the passenger. *Lewis*, 674 F.3d at 1305 (internal quotation marks omitted). And it was during that justified detention that the troopers uncovered the firearm and narcotics.

To begin, at the time he pulled the car over, Trooper Gutierrez knew that the car's registration was missing specific vehicle information and that the tag's actual expiration date (December 15, 2015) was different than the date printed on the car's paper tag (February 6, 2016). And when he initially spoke with Pierre-Louis, he was unable able to provide registration, title, or proof of insurance. Nor could he correctly name the vehicle registrant. At that point, Trooper Gutierrez began to question whether the car was stolen and whether the tag was fraudulent. After

running record checks on Pierre-Louis and the passenger, Trooper Gutierrez continued investigating the registration and tag discrepancies by radioing the car's VIN number to the Florida Highway Patrol dispatch. And he had reasonable suspicion to do so; he had an "objectively reasonable and articulable suspicion illegal activity [had] occurred or [was] occurring"—for example, tag fraud or potentially even vehicle theft. *Pruitt*, 174 F.3d at 1220 (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998)); *see also id.* (noting that having "no proof of ownership" and "no proof of authority to operate the vehicle" can support reasonable suspicion (quoting *Hunnicutt*, 135 F.3d at 1349)). Dispatch reported that the car was not listed as stolen but that the tag associated with it had expired in 2013—not 2015 or 2016 as the paper tag indicated.

By this time, Trooper Lopez had arrived on the scene. Armed with reasonable suspicion of criminal activity, the troopers had a "duty to investigate more." *United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015). To that end, they questioned Pierre-Louis and the passenger separately to "figure out why [Pierre-Louis] was driving this vehicle"; Trooper Gutierrez spoke with Pierre-Louis and Trooper Lopez spoke with the passenger. Doing so left them with more questions than answers. Pierre-Louis and the passenger gave "conflicting" descriptions of their itinerary; Pierre-Louis told Trooper Gutierrez that he was on the way to "meet a girl in Miami Gardens" and the passenger told Trooper Lopez

11

that they were "on their way to a funeral." During the questioning, Pierre-Louis was "visibly nervous," "fail[ed] to make eye contact," and he would not explain why he was in possession of the car. The passenger, meanwhile, was "high-strung" and "eager to claim his innocence for whatever was in the vehicle." He told Trooper Lopez that he was "just a passenger" and "had nothing to do with it."

These interviews only heightened the troopers' reasonable suspicion of additional criminal activity. Nervous behavior, a failure to maintain eye contact, and inconsistent or nonresponsive statements about an intended destination can all contribute to reasonable suspicion. *See id.* at 1256–57. Indeed, "as each answer to the [troopers'] investigative questions failed to allay [their] concerns, the [troopers'] reasonable suspicion was bolstered." *United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2005). On top of all that, Pierre-Louis's passenger was eagerly disclaiming ownership of "whatever was in the vehicle." So even if the troopers extended the stop beyond what was justified for the traffic infractions, "the facts that came to light from the beginning of the stop—facts giving rise to reasonable suspicion that an additional crime was being committed"—justified the troopers' continued investigation. *Id.* And it was during that investigation that Trooper Lopez walked his dog around Pierre-Louis's car. That dog, which alerted the troopers to the presence of contraband around the glove compartment, gave them probable cause to search that location. *See United States v. Tamari*, 454 F.3d

12

1259, 1265 (11th Cir. 2006) ("[P]robable cause arises when a drug-trained canine alerts to drugs." (internal quotation marks omitted)).  Accordingly, the district court did not err in denying Pierre-Louis's motion to suppress the evidence recovered from the search.

B.

Pierre-Louis next argues that the district court lacked subject matter jurisdiction over his § 922(g)(1) prosecution.  To convict a defendant under § 922(g)(1), the government must prove, among other things, that "the firearm traveled in or affected interstate commerce."  *United States v. Folk*, 754 F.3d 905, 915 (11th Cir. 2014).  Pierre-Louis asserts that the district court lacked subject matter jurisdiction because the government failed to establish an interstate commerce nexus.  He says that the government did not tie him "to the gun or to ammunition, but only perhaps to a magazine."  And, he says, there was no evidence that the magazine "had to travel in interstate commerce or that it was a weapon."  So, in his view, "there is no basis under federal jurisdiction to prosecute [him] for being in possession of a weapon."

We review de novo the district court's subject matter jurisdiction.  *See United States v. Grimon*, 923 F.3d 1302, 1305 (11th Cir. 2019).  Pierre-Louis's argument has no merit.  Federal district courts have jurisdiction over "all offenses against the laws of the United States."  *United States v. Brown*, 752 F.3d 1344,

13

1348 (11th Cir. 2014) (quoting 18 U.S.C. § 3231). "So long as the indictment charges the defendant with violating a valid federal statute as enacted in the United States Code, it alleges an offense against the laws of the United States and, thereby, invokes the district court's subject-matter jurisdiction." *Id.* at 1354 (internal quotation marks omitted). Even "when it comes to federal criminal statutes requiring an interstate commerce nexus, the government's failure to sufficiently allege or prove the interstate commerce element does not deprive the district court of its subject matter jurisdiction over the criminal case." *Grimon*, 923 F.3d at 1306. Because the government charged Pierre-Louis with "violating a valid federal statute," the district court had subject matter jurisdiction over this case.[1] *Id.* at 1305 (internal quotation marks omitted).

## C.

Third, Pierre-Louis claims that the district court abused its discretion by admitting evidence of his 2013 felon-in-possession conviction under Rule 404(b). He says that the evidence "was not inextricably intertwined with the charges

---

[1] Pierre-Louis's initial brief "fails to clearly raise any challenge" to the sufficiency of the evidence for his felon-in-possession conviction, so that argument is abandoned. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir. 2014); *see also Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("Any issue that an appellant wants the Court to address should be specifically and clearly identified in the brief.").

brought against [him], did not meet the standards of Rule 404(b), was highly prejudicial, and not probative of the charges."

We use a three-part framework to evaluate the admission of evidence under Rule 404(b). First, the evidence "must be relevant to an issue other than the defendant's character." *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003) (internal quotation marks omitted). Second, the proof must be such that "a jury could find that the defendant committed the extrinsic act." *Id.* (internal quotation marks omitted). And third, the evidence "must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403." *Id.* (internal quotation marks omitted). We review the admission of evidence under Rule 404(b) for an abuse of discretion, *see United States v. Culver*, 598 F.3d 740, 747 (11th Cir. 2010), and we will reverse a district court's erroneous evidentiary ruling only if the error was not harmless, *see United States v. Bradley*, 644 F.3d 1213, 1270 (11th Cir. 2011). An error is not harmless if, in light of the record as a whole, the error may have substantially influenced the outcome of the proceeding. *Bradley*, 644 F.3d at 1270.

We begin with the first factor. Under this factor, we ask whether the evidence was "relevant to an issue other than the defendant's character." *Jernigan*, 341 F.3d at 1280. Although Rule 404(b) prohibits using evidence of other crimes to show that the defendant "acted in accordance" with his bad character, evidence

15

of other crimes is admissible for any other purpose, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)–(2). Because Rule 404(b) is a "rule of inclusion," *Jernigan*, 341 F.3d at 1280, evidence is admissible "unless it tends to prove *only* criminal propensity," *United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008) (emphasis added) (internal quotation marks omitted).

Pierre-Louis's 2013 conviction was "relevant to an issue other than the defendant's character"—knowledge, intent, or absence of mistake. *Jernigan*, 341 F.3d at 1280 (internal quotation marks omitted). To convict Pierre-Louis under § 922(g)(1), the government needed to prove that he *knew* that he possessed a firearm. *See Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019). By pleading not guilty, Pierre-Louis placed that element at issue. *Jernigan*, 341 F.3d at 1281 n.7; *see also United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998) (stating that a not guilty plea "imposes a substantial burden on the government to prove intent"). The burden was therefore on the government to prove that Pierre-Louis knowingly possessed the firearm. *See United States v. Taylor*, 417 F.3d 1176, 1182 (11th Cir. 2005).

Evidence that Pierre-Louis knowingly possessed a firearm in the past is probative of knowledge to possess it in the present. Where "the state of mind required for the charged and extrinsic offenses is the same, the first prong of the

16

Rule 404(b) test is satisfied." *United States v. Edouard*, 485 F.3d 1324, 1345 (11th Cir. 2007). After all, there is a "logical connection between a convicted felon's knowing possession of a firearm at one time and his knowledge that a firearm is present at a subsequent time." *Jernigan*, 341 F.3d at 1281; *see also Taylor*, 417 F.3d at 1182 (holding that the district court did not abuse its discretion by admitting "evidence that Taylor had knowingly possessed a firearm at another point in time" to satisfy the mens rea element). In fact, it is "untenable" to say that a defendant's "previous, knowing commission of crimes that involved the possession of a weapon" does not "logically bear on his knowledge of the presence of gun" this time. *Jernigan*, 341 F.3d at 1281. Simply put, "the fact that [Pierre-Louis] knowingly possessed a firearm in a car on a previous occasion makes it more likely that he *knowingly* did so this time as well, and not because of accident or mistake." *Id.* at 1281–82. So the first factor is met.

Now for the second. Under this factor, we ask whether there is proof from which "a jury could find that the defendant committed the extrinsic act." *Id.* at 1280 (internal quotation marks omitted). There is. The prior conviction was sufficient proof for the jury to find that Pierre-Louis committed that act. Indeed, it is "elementary that a conviction is sufficient proof that [the defendant] committed the prior act." *Id.* at 1282 (alteration in original) (quoting *United States v. Calderon*, 127 F.3d 1314, 1332 (11th Cir. 1997)).

17

Finally, we turn to the third factor, which asks whether the "probative value" of the evidence is "*substantially outweighed*" by any unfair prejudice. *Id.* at 1282 (quoting *Calderon*, 127 F.3d at 1332). That determination "lies within the sound discretion of the district judge." *Id.* (quoting *Calderon*, 127 F.3d at 1332). It calls for a "common sense assessment of all the circumstances surrounding the extrinsic evidence, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *Id.* (internal quotation marks omitted). When applying this factor, we are mindful that Rule 403 is an "extraordinary remedy" that should be used "sparingly" and that the balance "should be struck in favor of admissibility." *Edouard*, 485 F.3d at 1344 n.8 (internal quotation marks omitted).

We first note that evidence of Pierre-Louis's 2013 felon-in-possession conviction was highly probative. As we explained above, evidence that a defendant knowingly possessed a firearm in the past is probative of a knowing possession in the present. *See, e.g.*, *Taylor*, 417 F.3d at 1182. But that is especially true when the crimes share key similarities. *See Jernigan*, 341 F.3d at 1282. In fact, we have said that similarities between a past crime and the charged one make the past crime "highly probative with regard to the defendant's intent in the charged offense." *United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005). And the past crime here resembles the charged one in important ways. *See*

*Jernigan*, 341 F.3d at 1282.  In fact, Pierre-Louis's 2013 conviction involved possession of a firearm that was kept under the dashboard in a car that he was driving.

For his part, Pierre-Louis argues that his 2013 conviction differed in some respects from the charged crime here.  For example, he says that in the 2013 case no drugs were involved and the gun was not hidden in a secret spot behind the glove compartment.  But a "prior crime need not be factually identical in order for it to be probative." *United States v. Sterling*, 738 F.3d 228, 238 (11th Cir. 2013).  And here, the similarities between the past crime and the charged crime make the past crime probative of the charged one.

Moreover, Pierre-Louis's 2013 conviction was not so "temporally remote" that it lacks probative value. *United States v. Matthews*, 431 F.3d 1296, 1311 (11th Cir. 2005).  As an initial matter, an appellant bears a "heavy burden" when attempting to show that a prior offense is "too remote to be probative." *United States v. Pollock*, 926 F.2d 1044, 1047 (11th Cir. 1991) (internal quotation marks omitted).  Pierre-Louis has not carried that burden.  His 2013 conviction came only about three years before the offense conduct here.  And prior convictions that far in the past are "well within the temporal bounds of relevance." *Jernigan*, 341 F.3d at 1282.  Indeed, this Court has often found that evidence of crimes as old or even much older than that still retain their probative value. *See, e.g., United States v.*

19

*Lampley*, 68 F.3d 1296, 1300 (11th Cir. 1995) (15 years); *Matthews*, 431 F.3d at 1312 (8 years).

Lastly, the evidence's prejudicial effect was minimized. For starters, the government did not introduce "certain especially prejudicial aspects of [Pierre-Louis's]" 2013 conviction, such as the fact that he was brandishing the firearm. *Jernigan*, 341 F.3d at 1282. Additionally, the district court gave multiple limiting instructions. A limiting instruction, of course, can "reduce the risk of inherent prejudice." *Ellisor*, 522 F.3d at 1268; *see also Edouard*, 485 F.3d at 1346 ("[A]ny unfair prejudice . . . was mitigated by the district court's limiting instruction to the jury."); *Calderon*, 127 F.3d at 1332 (same). In this case, the judge twice informed the jury that the evidence should not be considered for propensity purposes. And we must presume that the jury followed those instructions. *Cf. Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

Taken together, we cannot say that the district court abused its discretion in admitting Pierre-Louis's 2013 conviction under Rule 404(b).

### D.

Finally, Pierre-Louis argues that the district court abused its discretion by failing to dismiss a deliberating juror—Juror 19. To recap, about an hour into deliberations, Juror 19 sent a note to the judge. In it, Juror 19 said that she was concerned the deliberations would "last another day" and explained that she had

20

work appointments scheduled for the following day and, "most important[ly]," needed to be able to pick up her nine-year-old daughter. Pierre-Louis asked the court to release Juror 19, stating that he did not "want an unhappy juror there." The government, however, requested that the court give Juror 19 the following response:

> While[] we understand your schedule, tomorrow you will be asked to report at 10:00 a.m. If you need to leave early to pick up your daughter, please let us know the time that you have to leave.

The court agreed to issue the government's requested response. It observed that Juror 19 had been able to reschedule her appointments throughout the trial and that it would wait to see if she could do so again. Pierre-Louis asked the court if it wanted to speak with the juror, but the court declined to do so. Pierre-Louis then objected to the written response. At 4:56 pm, the court took a recess and, about 15 minutes later, the jury announced its verdict.

On appeal, Pierre-Louis argues that the district court should have "further investigat[ed]" Juror 19 or dismissed her from the jury. First, the district court did not abuse its discretion by declining to further investigate Juror 19. To be sure, "[j]uror misconduct concerning outside influences must be fully investigated to determine if any misconduct actually occurred and whether or not it was prejudicial." *United States v. Register*, 182 F.3d 820, 840 (11th Cir. 1999) (quoting *United States v. Harris*, 908 F.2d 728, 733 (11th Cir. 1990)). But the

21

"failure to hold a hearing constitutes an abuse of discretion only where there is evidence that the jury was subjected to influence by *outside sources*," *United States v. Watchmaker*, 761 F.2d 1459, 1465 (11th Cir. 1985) (emphasis added), such as "any private communication, contact, or tampering directly or indirectly" with a juror, *Remmer v. United States*, 347 U.S. 227, 229 (1954); *see also United States v. Moore*, 954 F.3d 1322, 1332 (11th Cir. 2020); *Harris*, 908 F.2d at 733; *Barnes v. Joyner*, 751 F.3d 229, 245–46 (4th Cir. 2014); *United States v. Muhammad*, 819 F.3d 1056, 1061–62 (8th Cir. 2016).

Juror 19's scheduling inquiry does not represent an "influence by outside sources" that requires further investigation. *Watchmaker*, 761 F.2d at 1465. To trigger the court's duty to investigate outside influences, Pierre-Louis must show "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *United States v. Benjamin*, 958 F.3d 1124, 1136 (11th Cir. 2020) (internal quotation marks omitted). But there is no evidence of "extrinsic contacts with the jury" or any members of it. *Moore*, 954 F.3d at 1332 (quoting *Crowe v. Hall*, 490 F.3d 840, 847 (11th Cir. 2007)). Nor is there evidence of influence by media publicity or jury consideration of matters not admitted into evidence. *See, e.g.*, *Remmer*, 347 U.S. at 229; *Muhammad*, 819 F.3d at 1061–62 ("Extraneous influence includes publicity received and discussed in the jury room, matters considered by the jury but not admitted into evidence, and

22

communications or other contact between jurors and outside persons." (internal quotation marks omitted)); *cf. United States v. Foster*, 878 F.3d 1297, 1310 (11th Cir. 2018) (stating that external matters include "publicity and information related specifically to the case the jurors are meant to decide"). And when the alleged misconduct did not stem from "media publicity or other outside influences, the court may use its discretion in deciding whether to interrogate the jurors." *Harris*, 908 F.2d at 733.

Moreover, the note that the district court received from Juror 19 did not require it to investigate whether she was biased or basing her decision on impermissible considerations rather than the evidence and the law. *See Register*, 182 F.3d at 840. The note expressed a simple concern about scheduling matters— one that the district court sought to accommodate in part by allowing Juror 19 to leave to pick up her daughter. And with respect to Juror 19's work appointments, the district court observed that Juror 19 had been able to reschedule her appointments throughout the trial and that it would wait to see if she could do so again before deciding on dismissing her. On the facts before us, declining to investigate further was not an abuse of discretion.

Second, the district court did not abuse its discretion by denying Pierre-Louis's request to dismiss Juror 19. We review a district court's decision whether to dismiss a deliberating juror for an abuse of discretion. *See United States v.*

*Sammour*, 816 F.3d 1328, 1338 (11th Cir. 2016). "Generally, courts should be cautious about dismissing a juror." *United States v. Oscar*, 877 F.3d 1270, 1287 (11th Cir. 2017). Once deliberations have begun, a district court may excuse a juror only on a finding of "good cause." *United States v. Brown*, 996 F.3d 1171, 1184 (11th Cir. 2021) (en banc) (quoting Fed. R. Crim. P. 23(b)(3)). Good cause "exists to dismiss a juror when that juror refuses to apply the law or to follow the court's instructions." *United States v. Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001). But as we explained above, there was no allegation or evidence that Juror 19 was biased or failing to fulfill her responsibilities as a juror.[2] So the district court did not abuse its discretion by declining to dismiss Juror 19.

**AFFIRMED.**

---

[2] Nor did the district court abuse its discretion by refusing to substitute an alternate juror for Juror 19. "A court may substitute an alternate juror for any juror who is 'unable to perform' or is 'disqualified from performing' [her] duties." *United States v. Crabtree*, 878 F.3d 1274, 1288 (11th Cir. 2018) (quoting Fed. R. Crim. P. 24(c)). Facts had yet to arise that support Pierre-Louis's assertion that Juror 19's ability to perform her role as a juror was "impaired." *Id.* (internal quotation marks omitted).